# Thomas *vs* Beckman.

APPEAL FROM A DECREE OF THE ESTILL CIRCUIT.

*Equity Jurisdiction. Lex-loci contractus. Authentication. Interest.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

HENRY H. THOMAS, of Estill county, Ky. having carried to Louisiana, a colored man named Ben Reed, claimed by him as his slave, and who had there escaped from his custody, employed Frederick Beckman, a Commission Merchant in New Orleans, to reclaim and sell the fugitive, and on the 23rd of May, 1826, gave to him the following written authority: "Should he (Beckman,) be "able to get in possession of my mulatto slave Ben, "I give him full power to sell him at auction on the best "terms. without (authority) to guaranty his character *ex-* "*cept the title.*"

During the year 1826, Beckman found Ben, sold him at auction, to one Florence, for $350, and gave him a Notarial bill of Sale in which, *both as agent and as surety for Thomas,* he guarantied that Ben was a slave—and after deducting his commission, he remitted to Thomas the price received for Ben.

Florence sold Ben to one Palfry. In 1829 Ben, claiming to have been born a free man, sued Palfry in Louisiana for detaining him as a slave. According to the mode of procedure under the civil code of that State, Palfry cited his guarantor, Florence, and the latter also cited Beckman to appear; and they did appear and respectively responded and interpleaded.

In December, 1831, Ben having, in the mean time, obtained a decree against Palfry for his freedom and for $450, the assessed value of his services whilst detained by him, a verdict and decree were rendered in favor of Palfry against Florence for $450, the consideration between them, and $450, the sum recovered by Ben, and another verdict and decree were rendered also, in favor of Florence against Beckman, for $350, the consideration be-

tween them, and for $450, as recovered by Palfry from Florence, for Ben's services, and interest on those sums, and the costs of the suit. And these decrees were affirmed by the Supreme Court of Louisiana.

Beckman having paid to Florence $1015 69, as the total amount of principal, interest and costs due under the decree, at the time of payment, filed a bill in chancery against Thomas in the Estill Circuit Court, in the year 1835, seeking a decree for what he had thus paid as his surety.

Thomas, in his answer, resisted the relief as sought, upon the following grounds: 1st. he denied the jurisdiction of a Court of Equity. 2d. He insisted that Ben was a slave, and that the record from Louisiana was no evidence against *him* of the facts (as therein adjudged,) that Ben was free. 3d. He denied that he could be justly or legally subjected to liability in consequence of Beckman's guaranty, which he denied having ever authorized, and he insisted that, if liable at all, his liability should not be extended beyond the measure prescribed by the laws of Kentucky, and that is, *the consideration of $350*, interest thereon, and costs of suit.

*Decree of the Circuit Court.* The Circuit Court however decreed that Thomas should pay to Beckman $1015 69 cents, and 6 per cent. interest thereon, from the filing of the bill in this case.

The points made in the answer have been again urged by the counsel of Thomas in this court: and, in revising the decree now sought to be reversed, we shall consider these points in their numerical order.

*Surety in a warranty, in a bill of sale of a slave, may sue his principal in Chancery, after being made responsible on the warranty.* 1. We cannot doubt that the written power given by Thomas to Beckman, authorized the latter, as agent, to guaranty that Ben was a slave, and also, in order to make the assurance the more satisfactory, to bind himself personally as a surety. Moreover, after Thomas had been acquainted with what Beckman had done, he seemed to ratify it and to recognize the fact that he was his surety in the guaranty.

Beckman, thus standing in the relation of surety for Thomas, had an indisputable right to sue him in Chancery for retribution, as far as he had, in that character,

paid money for him in discharge of the liability resulting from the authorized contract of guaranty.

2. Shortly after the institution of the suit by Ben, in Louisiana, and about two years before the final decrees in that suit, Beckman notified Thomas of its pendency, and requested him to aid in defending it. If, therefore, the nature of the privity between them, would not alone be sufficient to make the record of the suit in Louisiana evidence against Thomas, of the fact that Ben was a free man, the notification virtually made him a party, and the record is legal evidence against him of every fact decided between the immediate parties: and it is not material to decide whether the record is conclusive or only *prima facie* evidence against Thomas, for if it be *prima facie* only, it is sufficient in this case.

The only evidence, tending to show that Ben was a slave, is the fact that one Gentry brought him from South Carolina, and sold him as a slave: but, according to the proof, Ben's complexion and hair indicate that he is of Indian rather than African taint—and it appears that Gentry bought him in jail, *for the prison fees* only, for which he was sold, because, according to the local law, he had been imprisoned one year on suspicion that he was a fugitive slave, and no person had ever claimed him as such. These last facts conduce strongly to the conclusion that Ben was not a slave, and seem to us sufficient to repel any other presumption which might have been authorized by the fact that he had been claimed and held as a slave since Gentry's purchase; and, consequently, if the Louisiana record be only *prima facie* evidence, it remains unaffected by any countervailing fact or presumption.

We therefore consider the fact that Ben was a free man sufficiently established; and, of course, a recovery against Beckman on his guaranty being therefore proper, he has an unquestionable right, in equity, to demand some restitution from his constituent and principal Thomas.

3. But being, as already suggested, of the opinion that Thomas is liable to Beckman, here a novel question arises. According to the common law and the local law of Kentucky, Florence could have been entitled to recover from Beckman no more than $350, with interest

THOMAS
*vs*
BECKMAN.

A transcript of a record of a suit of a sister state, on a warranty in a bill of sale of slave, against a surety therein, where principal had notice of its pendency, is evidence here, against the principal, of every fact decided between the immediate parties to such suit.

thereon from the date of his guaranty. But, in addition to the consideration and interest, he recovered $450, which had been adjudged against him in favor of Palfry, because it had been recovered from Palfry by Ben, as the assessed value of his services, whilst detained by Palfry. And the Supreme Court of Louisiana has decided that this extra recovery was according to one of the articles of the local code of that State, which entitled the guaran-tee of property purchased to recover, when evicted by a paramount title, not only the price he paid the guarantor for it, but the value also of the profits which had been re-covered from him by the evictor, and which he himself would have enjoyed had there been no breach of the guaranty.

A surety sued in a sister state, on warranty of a slave there made, may recover a-gainst his princi-pal in this state, who had notice of the pendency of such suit, whatever may be legally adjudged against him by the laws of the sister state.

As then, the decree rendered against Beckman seems to have been authorized by the law of Louisiana—is Thomas liable to him for the amount paid by him in obe-dience to that decree, or should the law of Kentucky regu-late the measure of his liability?

The law of the place where a personal con-tract is to be per-formed, deter-mines its validity and the extent of its obligation— the lex loci con-tractus governs in such cases.

According to an established rule of comity, the law of the place where a personal contract is to be performed, determines its validity and the extent of its obligation, and when no other place is designated, by contract or by law, for performance, the *lex loci contractus* governs. The counsel for Thomas insists that, though the power was given in Louisiana, yet, as Thomas was known to be domiciled in Kentucky, we should presume that the par-ties intended that the indemnity should be made here, and according to our own local law. But this assumption is, in our judgment, made on either a misconception or a misapplication of the true principle of international com-ity. The contract of guaranty was made in Louisiana; was to be performed there, and was made by Thomas himself, as principal, through his authorized agent, and by Beckman, as his surety. Thomas' liability upon that contract must be determined, therefore, by the law of Louisiana, and consequently, whatever has been legally recovered upon that contract, from Beckman, as agent and surety, Thomas, upon principles of unquestionable jus-tice and comity, is bound to reimburse. Had Thomas, directly and alone, made the sale and guarranty to Flor-

ence, as he did indirectly and conjointly through Beckman, the *lex loci contractus* might have determined the extent of his obligations, no other place than that of the contract being fixed for performance of the guaranty. But however this might be, Beckman being domiciled in Louisiana, and having there become bound, personally, as guarantor for Thomas, the extent of his liability to Florence was determined by the law of *their* domicil, and his constituent having sanctioned the contract, as made, must undoubtedly be bound by the same law and to the same extent, and must indemnify his agent and surety for whatever loss has resulted to him according to the law of Louisiana, in consequence of that authorized guaranty.

We must presume that the decrees in Louisiana were all right, according to the local law.

The fact that only eleven jurors were permitted, by consent, to try the issues as between Palfry and Florence, and the latter and Beckman is, in our opinion, entitled to no influence in this case. The trial seems to have been full and fair, and according to the laws of the *Forum*, and should, therefore, be as effectual, in all respects, as it would have been had the verdict been found by twelve jurors.

Nor is there any ground for imputing to Beckman either fraud or negligence, or want of proper fidelity to Thomas in defending the suit in Louisiana.

And we are of the opinion that the Louisiana record, though certified only as a perfect record of the suit between Ben and Palfry, is sufficiently authenticated as a full record also of every thing done in Court between all the parties who were incidentally and subordinately involved in that suit, from the beginning to the ending of it—and that it sufficiently shows, *prima facie*, the amount of costs taxed against Beckman.

*Record of a sister state, certified to be a perfect record of the suit, held sufficient.*

We are also of the opinion that Beckman paid to Florence, in obedience to the decree $1015 69, and that this was not more than he was bound to pay. .

The conclusion seems, therefore, to be that, as to $1015 69, the decree in this case was proper. Thomas would have been liable for that amount had he, instead of

his guarantor, been sued by Florence; and had he, himself, defended that suit, the same decree would, as we must presume, have been rendered against him.

The only remaining question is as to the decree for six per cent. interest on the amount decreed against Thomas.

As the contract was made in Louisiana, and the guaranty enforced there against the surety, and no other place was fixed for reimbursement, we are of the opinion that the obligation of Thomas, as principal, should be determined by the law of Louisiana, and that it was his duty to make restitution or indemnity at the surety's domicil; and therefore, as interest is but a legal incident to the principal obligation, it seems to us that the rate of interest which Beckman has a right to claim, should be determined by the law of Louisiana.

But there is no proof as to the rate of interest in Louisiana. A certificate by the clerk of the Court which rendered the decree against Beckman, and which purported to show that interest had been calculated and paid by Beckman, on the decree, at the rate of five per cent. was rejected by the Circuit Judge at the instance of Thomas' counsel. Had it not been thus excluded it would have shown that Beckman was entitled to a larger sum than has been decreed to him even after charging interest at the rate of five per cent.

Where there is no proof of a prescribed rate of interest for money due in a sister state, six per cent. is to be allowed, (see statute of 1837, page 28.)

There being then no proof as to the prescribed rate of interest in Louisiana, it was proper to charge it at six per cent., according to the statute of 1837, (Session Acts, page 28,) which provides, that, in the Courts of this Commonwealth, six per cent. shall be presumed to be the legal rate of interest in any other State in the union unless there shall be some proof to the contrary.

Wherefore, the decree of the Circuit Court must be and the same is therefore affirmed.

*Turner* for appellant: *Hanson and Breck* for appellee.

The following petition for a modification of the Opinion was presented
and filed by appellant's counsel, and the opinion of the Court sus-
pended until the 21st October, 1840.

## PETITION FOR A MODIFICATION,
### (By Mr. Turner.)

The undersigned, counsel for the appellant, has ma-
turely examined the opinion delivered in this case, and is
constrained, by a sense of duty, to ask the Court to change
the same in the particulars hereinafter named.

It is with much reluctance that he presents this peti-
tion, because he knows the labors of the Court are great,
and as he believes very improperly, all required by law
to be performed in term time; and further, because from
the luck he has had in petitioning heretofore, he fears the
Court will hold him mistaken in his views of the law
bearing on the case—but as the case is a very hard one,
he has determined to make a trial.

The two particulars in which he complains, are these:
The Court has decided that the costs of the litigation in
Louisiana are *prima facie*, properly certified, and that the
inferior Court has not decreed too much by way of in-
terest.

First as to the costs. The laws of Congress and of
the State prescribe the manner in which the *public acts,
records and judicial proceedings* of other States shall be
authenticated, to make the same evidence in this State.
They require the same to be certified by the Clerk of the
Court, under the seal of his office; to which must be
added the certificate of the presiding Judge, certifying the
Clerk to be such, and that his certificate is in due form
of law.

The original record from Louisiana in this case, is cer-
tified as required by law. The Clerk's certificate to that
record is dated the 6th July, 1832, and is in the following
words:

"I, John L. Lewis, Clerk of the first Judicial District
Court of the State of Louisiana, do hereby certify, that
above and foregoing twenty-nine pages do contain a full

and complete transcript of the record of the case wherein Benjamin Reed, F. M. C. is plaintiff, and H. W. Palfry is defendant, instituted in this Court, and now on the records thereof, under the number 8273. In testimony whereof, I have hereunto set my hand and affixed the seal of said Court, at the city of New Orleans, on this 6th day of July, in the year of our Lord one thousand eight hundred and thirty-two, and in the fifty-seventh year of the Independence of the United States.

*John L. Lewis, Cl'k.*

The Judge's certificate is dated 16th July, 1832, it reads thus:

"I, Joshua Lewis, sole Judge of the first Judicial District Court of the State of Louisiana, do hereby certify, that John L. Lewis is Clerk of the said Court, and that the signature *John L. Lewis, Cl'k.* to the above certificate, is in the proper hand writing of him the said Clerk; to his official act, as such, full faith and credit is due and owing; and I do further certify, that this certificate is in due form of law. Given under my hand and seal at the City of New Orleans, on this 16th day of July, in the year of our Lord eighteen hundred and thirty-two.

*Joshua Lewis.*"

At the conclusion of the Judge's certificate, is this statement, "Costs 12 75," which is probably the costs of the copy of the record, and should have been certified as such, as we contend, in the Clerk's certificate. After all this, there is wafered to the bundle of papers on which the record is made out, a certificate of the Deputy Clerk of the Court who certified the original record, that the taxed costs in the case amounted to $129; this certificate is dated 23d July, 1832—is seven days later than the Judge's certificate; it has no official seal attached to it, and is merely certified by a Deputy, who does not say who his principal is. It reads thus:

"Benjamin Reed, F. M. C. *against* J. W. Palfry, J. L. Florence, and F. Beckman, No. 8273. First Judicial District Court. I hereby certify, that the taxed costs in this case amount to one hundred and twenty-nine dollars and cents. Clerk's office, 23d day of July, 1832.

*H. Farrie, D. Clerk.*"

Next comes the certificate of W. E. Murphy, who says that he certifies *for the Sheriff*, and states that his costs are $32 50; this certificate is dated 23d July, 1832, seven days after the Judge's, and reads as follows:

"I certify the Sheriff's fees in this case to be thirty-two 50-100 dollars.

For the Sheriff,     *W. E. Murphy.*"

And last is the certificate of the Clerk of the Supreme Court, stating that the costs in that court were $21 51 cents; it is in these words:

"Supreme Court of Louisiana. In the matter of Benj. Reed, F. M. C. *against* Henry W. Palfry, Florence and Beckman, called in warranty—appeal from the First Judicial District Court. ' I hereby certify, that the costs of this appeal amount to twenty-one dollars and fifty cents. New Orleans, July 20th, 1832.

*N. B. Lebretem, Cl'k.*"

We maintain that the costs of the suit are a part of the public acts, judicial proceedings, and record of the Court in Louisiana, and as such, should be verified by the same authentication as the judgment of the Court, for the principal debt, or matter in controversy, and if not so authenticated, when brought here from a foreign state, they cannot be recovered; nor can the fact, that Beckman had paid those costs, as Thomas' agent or surety, alter the case; the evidence that such costs were decreed, or had accrued, is still wanting, to show that Beckman properly paid them.

We, therefore, most earnestly contend that there is *no legal evidence* in the record, in this case, of the amount of costs in Louisiana, and that the same should not be decreed against Thomas.

If those costs are excluded, then the decree of the Circuit Court was for too much.

The Circuit Court assumed that Beckman paid Florence, the judgment against him, on the day this suit was instituted in the Circuit Court, which was the 22d April, 1835.

The judgment of Florence against Beckman, was for $350, with the legal interest from the 10th June, 1830, until paid, and $450 in damages, besides costs.

"The Court, being satisfied with the verdict of the jury, on the demand of J. L. Florence, do, by reason thereof, order and adjudge, that judgment be entered in favor of said Florence, against the defendant, Frederic Beckman, for the sum of three hundred and fifty dollars, with legal interest thereon, from the 10th day of June, 1830, until paid, and for the further sum of four hundred and fifty dollars, damages and costs of suit.

Signed,          <em>Joshua Lewis</em>."

The $350, with interest thereon, from the 10th June, 1830, to the 22d April, 1835, makes $452 20 cents, which, added to the $450 damages, makes $902 20, instead of $1025 69 cents, which Beckman proves he paid, and the Circuit Court has decreed, with interest, after the rate of six per centum per annum, from the 22d April, 1835, until the 17th April, 1839, the day on which the decree appealed from was rendered, amounting, in all, to $1255, besides costs; whereas, agreeable to the principles we contend for, if interest is allowed for the latter period, on the whole sum, there should have been only $1118 decreed to Beckman, that being the amount of $902 20 cents, with legal interest on the same from 22d April, 1835, to 17th April, 1839.

It will be seen that the Court in Louisiana only gave interest, by the judgment it rendered, on the $350, the price of the negro sold by Beckman to Florence, and did not adjudge interest on the $450 damages; hence I have not calculated interest on the damages up to the presumed time of payment by Beckman, as the $450 damages did not carry interest by either the laws of Kentucky or Louisiana, in force at the date of the judgement, or of the payment by Beckman.

2d. We contend that the demand of Beckman against Thomas, did not, as a matter of law, carry interest. Had the sum in controversy been paid in Kentucky, it would not have carried interest against Thomas—the chancellor never gives interest, except in cases where it is given at law. The Statute of 1799, second Vol. Laws of Kentucky, 853, sec. 2d, makes "debts founded on any specialty, bill, or note in writing, ascertaining the demand," carry interest.

The demand of Beckman against Thomas is for money paid to his use, and is not *founded* on a judgment specialty, bill or note in writing, but is founded on the verbal assumpsit of Thomas, express or implied.

The act of 1837, reads in these words: "That inter- "est, at the rate of six per centum per annum, on each "one hundred dollars, and at that rate for a greater or "less sum, and for a longer or shorter time, shall be ta- "ken and held in all the courts of this Commonwealth, "to be the rate of interest authorized to be recovered in "the several States, &c." See Session Acts of 1836-7, page 28.

Now this act does not pretend to say what debts shall, and what debts shall not carry interest. This is regula- ted by other laws, and when it is ascertained by those laws that a particular debt carries interest, that quoted, fixes the rate. That the $450, and the costs, did not carry interest by the laws of Louisiana, is conclusively shown by the judgment there.

But we contend that the statute of 1837, should not be construed to embrace rights that had already accrued, and especially suits then pending; in other words, it should not be construed to act retrospectively. See the cases of *Feemster* vs *Ringo*, 5 *Monroe*, 336, and *Ducham* vs *Smith*, *Ib*. 375.

Retroactive legislation has been condemned by all modern civilized nations, and this Court has uniformly construed statutes not to embrace pre-existent rights, un- less compelled to do so by the express letter of the stat- ute. See on this subject, the very just remarks of Mr. Madison, in the 44th number of 'The Federalist.'

Besides, the constitutionality of the act under consid- eration, so far as it may be construed to affect vested rights, may be well questioned.

One leading object for framing our State Constitution was to secure private rights. Now as the law stood prior to 1837, a debt contracted in a foreign State, carried no interest in Kentucky, or at least none was recoverable, unless upon evidence that such debt carried interest in the State where contracted, and the rate it did carry; was it not then affecting Thomas' private rights for the

THOMAS
*vs*
BECKMAN.

legislature to declare, in the absence of all evidence on the subject, that this demand had been carrying, and that Thomas should be liable to pay six per centum interest, for seven years prior to the passage of the law. Whereas, in the same absence of evidence that it carried interest, and the rate it carried in Louisiana, the law of Kentucky, before that statute, did not render him liable for any interest, and there is no evidence in the record, in this case, that the laws of Louisiana give any interest, and if any, after what rate. On the contrary, as above shown, it appears that a large part of it did not.

The laws of a country enter into and become a part of the contracts made under them. Hence the rate of interest that a debtor is bound to pay is, without being expressed in the contract, a part and parcel of the contract; and any law enacted after the date of the contract, that increases or diminishes that rate of interest, or makes the demand carry interest when, by the law in force at its date, it did not carry interest to that extent, changes the contract and affects the private rights of the parties.

Hence a general law, increasing or diminishing the rate of interest, is never construed to apply, nor could it constitutionally embrace or take effect as to contracts previously made.

If we are correct in the above views, then the sum decreed by the Circuit Court, should be reduced to eight hundred dollars, and will result in a reversal. All which is respectfully submitted.

S. TURNER, *for appellant.*

*October 21.*    The following response was made by the Court to the appellant's petition for a modification, viz:

### RESPONSE.

It is unnecessary now to decide whether the taxation of costs by a clerk, which is a ministerial act, performed generally in vacation, should be deemed a judicial proceeding on record, nor whether, if it should be so considered, the taxation exhibited in this case might be understood as being embraced in the record, which is admitted to have been certified according to the act of

Congress, for were we to concede that the amount of costs, as certified, is not sufficiently established either by the record or the clerk's certificate, still it is, in our opinion, satisfactorily proved by other and extraneous evidence. Florence, in his deposition, which was read without any objection, after reiterating all that his judgment against Beckman shows on its face, deposed "that "the said Beckman paid deponent the said debt, dama-"ges, interest, and *costs, amounting in all to* $1015 69–"100, *exclusive of the costs of the Supreme Court on ap-"peal.*" This aggregate amount, together with six per cent interest thereon, from the institution of this suit by Beckman, was the sum decreed against Thomas by the Circuit Court.

Now the fact that costs had been adjudged against Beckman, in Louisiana, and there paid by him, being not only uncontroverted but incontrovertible, it does seem to us that *Florence's* testimony, read without objection to its competency, should be deemed amply sufficient to prove, *prima facie*, the amount of costs as taxed and paid, even if the taxation should be considered an indisputable matter of record; and the more especially when the $1015 69–100, paid to Florence, does not exceed the aggregate composed of the $350, and interest thereon, and of the $450, damages, without interest, as adjudged, and of the sum certified by the clerk as the amount of the costs, excluding those in the Appellate Court of Louisiana, which were not allowed to Beckman by the decree in this case.

It still seems to us, therefore, that the Circuit Judge did not err in assuming that the amount of costs taxed against and paid by Beckman, was that which was certified in the appendage to the record and proved by Florence.

Nor have we changed, or been brought to doubt our former opinion, as to *Beckman's* equitable right to six per cent interest on the sum which he was compelled to pay for *Thomas*.

In *foro consciencia*, a surety who has paid money for his principal, is entitled not only to restitution of the amount so paid but to compensation also for the depriva-

THOMAS
*vs*
BECKMAN.

tion of the use of it, and not only is this moral right sanctioned, to this extent by universal law, as recognized by all christian nations of this age, but it is legalized by the *civil law*, which is the basis of Louisiana Jurisprudence. In a suit in equity; therefore, in a court of this State, by a surety against his principal for retribution for money paid in a foreign State, a *Chancellor* would not, in our opinion, transcend the sphere of his judicial duty, to presume that interest on the sum paid is not forbidden by the foreign law, and the more especially when that law is the local code of *Louisiana*.

Then the Statute of 1837, only prescribes a *rule of evidence* in our own courts for fixing the amount of interest in the absence of any other proof than the presumption legalized by this prudent enactment itself. This effect of the statutes surely cannot be deemed either unconstitutional or retroactive: for it must be admitted that the *lex fori* should determine the remedy and the competency and effect of evidence in the courts of the State in which relief is sought by suit. And in this case, Thomas should not complain that the act of 1837 divests him of any right or operates injuriously on his implied contract, because it permitted him to prove, either that he was not liable by the law of Louisiana for any interest, or that the rate of interest in that state was less than in this.

Nor, for the same reasons, could the act of 1837 be deemed unconstitutional or even retrospective if it intended, as perhaps it did, to authorize the presumption, in the absence of any evidence to the contrary, that interest is allowable in a foreign State, whenever it would be allowed, in the like case, by the law of this Commonwealth.

We are, therefore, clearly of the opinion that the act of 1837 is neither unconstitutional, retroactive, nor unreasonable in its operation.

Wherefore, being still satisfied with the opinion heretofore rendered in this case, the petition for a re-hearing is overruled.